GRAY and others, doing business under the firm name of TAPER-SLEEVE PULLEY WORKS, Citizens of the State of Pennsylvania, *v.* TAPER-SLEEVE PULLEY WORKS, a Corporation of the State of Iowa.

*(Circuit Court, W. D. Pennsylvania.  May Term, 1883.)*

1. TRADE NAME—RIGHT TO SELL ARTICLE—INJUNCTION.

C., under the style of A. B. Cook & Co., was engaged for several years at Erie, Pennsylvania, in the manufacture and sale of sundry patented devices, to one of which he gave the name "taper-sleeve pulley," displaying on his factory the sign, "Taper-sleeve Pulley Works." In 1876 his establishment was sold by the sheriff to W., to whom C. assigned his patents. W. soon sold the establishment to one of the complainants, with the exclusive right to said patents for the territory east of the Mississippi river, and the right also to sell the devices west of said river upon the payment of certain royalties, W. reserving to himself and assigns the right to sell on like terms east of said river. The complainants adopted as their trade name the designation "Taper-sleeve

Pulley Works," and in that name built up a large general trade throughout the United States. In 1882 W. sold to one Christian the territorial right in said patents in certain states west of the Mississippi, with his reserved right to sell east of that river. Christian and his associates selected Dubuque, Iowa, as their place of manufacture, adopting as their firm name " Farrar, Christian & Co.," but in December, 1882, organized themselves into an Iowa corporation, assuming the corporate name, " Taper-sleeve Pulley Works," and issued catalogues, price-lists, and advertisements which are almost exact *fac similes* of those of the complainants. *Held,* that while the Iowa corporation, having the right to make and sell the device called the " taper-sleeve pulley," had also the right to so designate the article and advertise itself as a manufacturer and vendor thereof, it had no right to assume the complainants' trade name, " Taper-sleeve Pulley Works," and the complainants were entitled to equitable protection in the exclusive use thereof.

2. FOREIGN CORPORATION—TORTS—JURISDICTION.

For a tort committed by a foreign corporation within the state of Pennsylvania, such corporation is liable to be sued therein if found in the state in the person of an officer or agent upon whom process may be served.

In Equity.

*J. K. Hallock,* for complainants.

*W. F. McCook* and *Clark Olds,* for defendants.

ACHESON, J. For several years prior to December 16, 1876, A. B. Cook, Jr., under the business name of A. B. Cook & Co., was engaged at the city of Erie, Pennsylvania, in the manufacture and sale of wooden pulleys, pulleys with friction fastenings, dead-pulley rigs, shaft-hangers, etc., under certain letters patent of the United States of which he was then the sole owner. To the pulleys having friction fastenings Cook gave the name of "taper-sleeve pulleys," and by that appellation they became known to the trade and public. On the building leased by him in which he carried on business, he displayed a sign which read "Taper-sleeve Pulley Works." Upon the date above-mentioned, on an execution against him, the entire machinery, stock, etc., of his said establishment were sold by the sheriff to James R. Willard, to whom Cook assigned said patents. From December 16, 1876, to May 26, 1877, Willard was the proprietor of the establishment, and for most of that time he maintained an advertisement in a newspaper of general circulation at Erie, offering the machinery, etc., for sale, in which he designated the concern as the "Taper-sleeve Pulley Works." By an article of agreement dated May 26, 1877, Willard sold to A. H. Gray, one of the complainants, the said property, describing it as "the property known as the Erie Wooden-pulley and Taper-sleeve Coupling Works," together, also, with the exclusive right to said patents for all that part of the United States lying east of the Mississippi river, (except the state of Minnesota;) the article

providing that either party thereto, or his assigns, might sell goods manufactured under the patents within the territory of the other, paying for the privilege certain specified royalties; but until Willard or his assigns should engage in the manufacture within the reserved territory, Gray to have the free privilege of selling therein.

Immediately after his purchase Gray took possession of the said property and business, and forthwith adopted the designation "Taper-sleeve Pulley Works" as his trade name; and under that style and title the entire business has since been continuously conducted,—at first, by Gray alone, and then by him and H. C. Crowell, the other complainant, as copartners. When Gray took the works the business was confined to a small local trade; but the complainants, by their energy and a liberal expenditure of money, have built up a very large general trade all over the United States and in foreign countries. It is especially large in the states of Ohio, Indiana, Illinois, Wisconsin, Michigan, and Minnesota. The complainants have agencies at Minneapolis, Chicago, Detroit, Saginaw, Cleveland, Toledo, Cincinnati, St. Louis, New Orleans, Baltimore, Atlanta, New York city, Rochester, and Buffalo, all of which advertise the complainants' wares as the goods of the "Taper-sleeve Pulley Works." The line of goods manufactured and sold by the complainants is much fuller and more complete than was that of A. B. Cook & Co., and while but one of the articles made by them can be called a taper-sleeve pulley, all of whatever nature have been and are stamped or marked "Taper-sleeve Pulley Works," and by that name the complainants' business and their goods are everywhere known.

By contract dated July 14, 1882, the said Willard sold and granted to Charles E. Christian, of the said city of Erie, the right to manufacture and sell articles under the said patents in Minnesota, and nine other named states and territories lying west of the Mississippi river, together with the right to sell such articles east of that river under the stipulations contained in the agreement with Gray of May 26, 1877. Christian soon associated with himself Charles W. Farrar, Edwin Bindley, and Clark Olds. These persons selected Dubuque, Iowa, as their place of manufacture, and adopted as their firm name "Farrar, Christian & Co.," and used that style and title (although they had not yet begun to manufacture) until December 13, 1882, when they organized themselves as a corporation under the laws of the state of Iowa, by filing articles of incorporation with the county recorder, assuming the corporate name of "Taper-sleeve Pulley Works."

The corporation has issued and circulated catalogues, price-lists, and advertisements in the western district of Pennsylvania, and generally throughout the United States, in the name of "Taper-sleeve Pulley Works," some of which are exact *fac similes* of the complainants' catalogues, price-lists, and advertisements, except that the words "Dubuque, Iowa," are substituted for "Erie, Pennsylvania," and the words "A. H. Gray, treasurer," and "H. C. Crowell, super-intendent," are omitted. The complainants have used a green label on their taper-sleeve pulleys containing directions for their use. The defendant company has had printed at Erie, off the form used for the complainants, labels identical in color and otherwise with those of the complainants, and is using them on the article of its manu-facture. It has also had printed at Erie circulars from the same type and wood cuts used for printing the complainants' circulars, with such changes only as are necessary to adopt them to its use. On all goods sold by the defendant the name "Taper-sleeve Pulley Works" is marked or branded, with the addition "of Dubuque, Iowa."

The foregoing are the material facts of the case, and by the evi-dence before the court are established clearly. There are affidavits also to show that, by reason of defendant's said acts, considerable confusion has already arisen among the complainants' customers, some sup-posing the complainants have moved their business to Dubuque, and others thinking they have established a branch concern there.

The complainants seek to have the defendant company restrained by injunction from using the name "Taper-sleeve Pulley Works." Are they entitled to such relief?

It will be observed that the complainants do not claim to have the exclusive right to use the descriptive appellation, "Taper-sleeve Pul-ley." They freely admit that the defendant, having the right to make and sell that device, has also the right to designate it by the name it has acquired in the trade. Nor do they question the right of the de-fendant company to advertise itself as a manufacturer and vendor of taper-sleeve pulleys. They object not to honest rivalry. Their com-plaint is against what they assert is unfair competition, by reason of the unnecessary and hurtful appropriation by the defendant of their long-used and established trade name, by which their wares are everywhere favorably known, and upon which their good business reputation rests.

That a lawful trade-mark, whether consisting of words or devices, is entitled to equitable protection, is now so well understood that it is scarcely necessary to cite authorities in support of the principle.

"Everywhere" (says the supreme court in *McLean* v. *Fleming*, 96 U. S. 252) "courts of justice proceed upon the ground that a party has a valuable interest in the good-will of his trade, and in the labels or trade-mark which he adopts to enlarge and perpetrate it." Hence, one will be protected in the enjoyment of his trade name to the same extent that trade-marks are protected, and for the like reason. *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Manuf'g Co.* 37 Conn. 278; *Newby* v. *Ohio Cent. R. Co.* Deady, 609; *Lee* v. *Haley*, L. R. 5 Ch. App. 155. "It is," says GIFFARD, L. J., "a fraud on a person who has established a trade, and carries it on under a given name, that some other person should assume the same name, or the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name." Id. 161.

The present case turns upon the determination of the question, had Gray the right to assume the exclusive use of the name "Taper-sleeve Pulley Works" as a business designation? And why not? True, it did not originate with him, but this of itself is an immaterial circumstance. *Canal Co.* v. *Clark*, 13 Wall. 311, 322. It did, however, originate with his predecessor in business, A. B. Cook, Jr., and whatever right he may have acquired therein impliedly passed, I incline to think, to Willard, the sheriff's vendee, and from him to Gray. Kerr, Inj. 479. But if not, Cook having abandoned the name, Gray had the right to appropriate it (Browne, Trade-marks, §§ 676, 677) if it could be lawfully selected as a trade name. Was it without the limits of rightful selection, as the defendant maintains? It is undoubtedly accepted law (as we see by reference to *Amoskeag Mauf'g Co.* v. *Spear*, 2 Sandf. 606) that no one has the right to the exclusive use of any words which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. Speaking on this point, Mr. Justice STRONG, in *Canal Co.* v. *Clark, supra*, said:

" The trade-mark must, either by itself, or by association, point distinctively to the origin or ownership of the article to which it is applied.'

And two rules are stated by him in restriction of the right of selection.

"No one can claim protection for the exclusive use of a trade-name or trade-mark which would practically give him a monopoly in the sale of any goods other than those produced or made by himself * * * Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, in-

gredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection."

Is there anything in these rules which the defendant company can invoke to justify it in assuming the business name hitherto in the exclusive use of the complainants? The title when adopted by Gray was novel as a trade name,—it is certainly a very peculiar trading appellation,—and by long association it has become inseparably identified with the complainants' business, pointing directly to the origin of all the wares, of every kind, of their manufacture. The title "Taper-sleeve Pulley Works" is not merely descriptive of an article of manufacture or trade, as the words "Lackawanna coal" were (in *Canal Co.* v. *Clark*) held to be. Nor does this name, by any means, give the complainants a monopoly in the manufacture and sale of the device called the "taper-sleeve pulley." The defendant may unrestrictedly use that name as descriptive of such pulleys of its manufacture. The distinction between such use of those words and the assumption of the complainants' trade name is of easy comprehension, and was well understood by the corporators composing the defendant company, whose original purpose it was to carry on their operations under the firm name "Farrar, Christian & Co."

In *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Manuf'g Co., supra,* the defendants were enjoined from using in their corporate title the names of "Holmes" and "Booth," although stockholders of the company. In *Lee* v. *Haley, supra,* the plaintiff, who had carried on business for some years at No. 22 Pall Mall, under the style of "The Guinea Coal Company," had an injunction to restrain the defendant from carrying on a rival business in Pall Mall under the name "The Pall Mall Guinea Coal Company," notwithstanding it was shown that other dealers in coal calling themselves Guinea coal companies, some with prefixes and others without, were carrying on business at various places elsewhere, but in such situations that they were not likely to be mistaken for the plaintiff. In *Brooklyn White Lead Co.* v. *Masury,* 25 Barb. 416, the defendant, a white-lead manufacturer in Brooklyn, was restrained from the use of the word "Company" or "Co.," although, confessedly, he had the right to describe his white lead as Brooklyn white lead.

It is true, in each of these cases there were circumstances suggestive of fraud, or from which at least might be legitimately inferred an intention on the part of the respective defendants to benefit themselves at the expense of the other party. But in this regard how is it with the defendant here? How comes it that the title "Farrar,

Christian & Co." is discarded and the trade name of the complainants substituted? Why the close imitation by the defendant of the complainants' labels and circulars? The defendant company, indeed, in its answer, stoutly denies any fraudulent purpose or intention to injure the complainants. But the company must be judged by its acts rather than by its words. It requires a great stretch of charity to acquit the defendant of actual wrongful purpose. But, whatever the secret intent, the stubborn fact remains that the conduct of the defendant does tend to induce the public belief that its establishment is a branch of the complainants or connected therewith, and it must be taken to intend the natural consequences of its acts.

The defendant justifies under the contract of sale between Willard and Christian. But Willard did not thereby profess to pass to Christian the right to use the name "Taper-sleeve Pulley Works;" nor was it in his power to do so. What Christian did acquire, and the defendant may freely exercise, is the right to make and sell the taper-sleeve pulley, and to so designate the article, just as the Brooklyn manufacturer had the conceded right to call his product Brooklyn white lead.

It is, however, urged that it is impossible that the works at Dubuque, Iowa, should be confounded with the works at Erie, Pennsylvania, and highly improbable that any one should be misled, as the words "of Dubuque, Iowa," are plainly added to the defendant's name on its goods, and also appear in all its advertisements, circulars, etc. But the business of the complainants and defendant, respectively, is not local; their trade is co-extensive with the whole country, and even passes beyond. The complainants' most fruitful field of operations lies nearer to Dubuque than to Erie, and into that field the defendant may enter to sell under the reservation in the contract between Willard and Gray. There is credible evidence that no little confusion has actually arisen, and I think such is the unavoidable result of the double use of the same trade name in this business.

In my judgment, the complainant's right to equitable protection is as clear, and the necessity for the exercise of the restraining power of the court is as urgent, as in any case to which my attention has been called, in which the like relief was granted.

But the jurisdiction of the court is disputed, the defendant being a foreign corporation, and a motion has been made to set aside the service of the subpœna and dismiss the bill. The return of the marshal shows a service, on its face entirely regular, upon the president

of the corporation, Edwin Bindley; and as a corporation is liable to be sued in a state other than that of its creation and citizenship, if "found" therein, the only question to be settled here is whether the defendant was amenable to the process of the state courts for the cause of action complained of and the service authorized by the state law. *Ex parte Schollenberger*, 96 U. S. 369; *Merchants' Manuf'g Co.* v. *Grand Trunk Ry. Co.* 13 FED. REP. 358. In Pennsylvania, by the act of March 21, 1849, in the commencement of any suit or action against a foreign corporation, process may be served upon any of its officers, agents, or engineers. Pur. Dig. 287; *Lehigh Co.* v. *Boom Co.* 6 Weekly Notes Cas. 222; *Coxe* v. *Camden & A. R. Co.* 11 Weekly Notes Cas. 386. And suits may be instituted against a foreign corporation by service of process conformably to the act of 1849, notwithstanding it has failed to establish a place of business in the state, and appoint an agent upon whom service may be made agreeably to the state constitution and act of April 22, 1874. *Hagerman* v. *Empire Slate Co.* 97 Pa. St. 534.

The president of the defendant company was not in this state casually when served by the marshal. He is a citizen of Pennsylvania, and a permanent resident in the western district. The bill charges that he transacts "the business of president of said corporation at Pittsburgh, Pennsylvania;" and although this is traversed, there is at least slight evidence tending to sustain the averment. However, it is shown that the defendant has procured labels and circulars, in infringement of the complainants' rights, to be printed within the western district of Pennsylvania, and has caused such circulars to be distributed therein. This, in connection with the president's residence therein, it seems to me, is "doing business" sufficiently to make it amenable to the courts here. But, after all, the foundation of this suit is a continuing tort, wide-spread in its nature and results; the company's tortious acts being in part actually committed within this state and district. Now, for a tort committed by a foreign corporation within this state, I have no manner of doubt the corporation may be sued here, if found within the state in the person of an officer or agent upon whom process may be served. The defendant's motion must be denied.

A preliminary injunction will be allowed. Let counsel prepare and submit the form of decree.